FILED

NOV 1 0 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARLENE PICKENS,

    Plaintiff,

08-cv-6305-PK

OPINION AND ORDER

UNITED STATES OF AMERICA,

    Defendants.

_____

PAPAK, Judge:

    Plaintiff Marlene Pickens filed this negligence action against defendant United States of America arising out of alleged injuries to her hearing as a result of an alarm on a U.S. Postal Service vending machine. This court has jurisdiction under 28 U.S.C. § 1346(b), governing actions in which the United States is a defendant. The United States' motion for summary judgment (#32) and motion to strike Pickens' expert statement (#54) are now before the court. For the reasons set forth below, the motion to strike is denied but sanctions are imposed under

Page 1 - OPINION AND ORDER

Fed. Rule Civ. P. 37 as described below, and the defendant's motion for summary judgment is granted.

## BACKGROUND

From 1995-2008, the United States post office in Sherwood, Oregon has used a model 1625B postal products vending machine to dispense postal products to the public. (Breiner Decl., # 38, at 2.) The U.S. Postal Service first placed the 1625B vending machine into service in the early 1990s and, by July 2005, had 4,270 such machines in service, including 70 in the Portland District. (Bennett-Hunter Decl., # 36, at 2.) The postal service began to take the machines out of service in 2008, when it decided to remove vending machines from all locations due to the age of the machines, the availability of repair parts, service costs and decreasing stamp sales. (Bennett-Hunter Decl., # 36, at 2, Breiner Decl. Ex. C.) In February 2008, the 1625B machine at issue in this case was removed from the Sherwood post office as a result of this policy. (Breiner Decl. at 5, Ex. D.)

### I.    The 1625B Alarm System

The 1625B has a security alarm and strobe light security feature. (D'Amato Decl., #40, at 2.) Although maintenance technicians can adjust the sensitivity of the sensors that trigger the security system, the volume of the alarm itself cannot be adjusted. *Id.* After three minutes, the alarm shuts off automatically. *Id.*

Standard customer use does not trigger the security alarm. (Bourne Decl. at 3.) Rather, the alarm will sound if a customer hits or moves the machine or otherwise manipulates it outside of the normal course of selecting and paying for postal products. (Bourne Decl. at 3; Breiner Decl. at 3, Kracke Decl. Ex. C at 25, 42.) The machine, however, was temperamental to the

Page 2 - OPINION AND ORDER

extent that the alarm would sound if the machine door was open and the person stocking it did

not carefully key in the access code. (Bourne Decl. at 3; Breiner Decl. at 3.) The Sherwood

postmaster could not recall an instance when a customer triggered the security alarm by pressing

the coin-return button, nor did he know of an instance where the alarm triggered spontaneously.

(Breiner Decl. at 3.) The machine did not bear a warning telling customers that an alarm would

sound if children played on the machine or if a customer jostled the machine. (Kracke Decl. Ex.

C at 66, Ex. D at 22-23.)

The purpose of the 1625B security alarm is to prevent theft and damage to the machine

and to alert postal service employees to a potential security issue. *Id.* The 1625B machine has

the capacity to hold $20,650 in postal products and $1,350 in cash to make change for customers.

*Id.* at 3. The machines are occasionally subject to acts of theft and vandalism. (Cort Decl., #39,

at 3-4, Fernald Decl., #41, at 2.) The long-time Sherwood lead sales associate, however, could

not recall an instance when the alarm sounded when a person was actually trying to break into the

machine and the postmaster testified that usually the customer remained by the machine after the

alarm sounded. (Kracke Decl. Ex. C at 31, Ex. D at 18.)

The 1625B machine in the Sherwood office typically held about $4,500 in stock and cash.

(Cort Decl., #39, at 2.) It brought in approximately $1,000 to $1,200 in revenue weekly and

$2,500 to $10,000 monthly. (Bourne Decl., #37, at 2; Cort Decl., at 2.) Sherwood's 1625B

machine was in the outer lobby, which was open to the public at all times, including when the

post office service counter was not open. (Breiner Decl. at 2.) In 2006, someone broke into the

post office boxes in the outer lobby at the Sherwood post office. (Breiner Decl. at 4.) In

addition, there have been several instances when someone triggered the 1625B machine's security

alarm after hours or over the weekend. *Id.*

## II.      Pickens' Encounter With the 1625B Alarm System

On a Saturday in July 2005, Pickens visited the outer lobby of the Sherwood post office accompanied by her 5-year-old grandson. (Second Am. Compl., #28, at 1, Martin Decl. Ex. A at 3.) The building and parking lot were empty at the time. *Id.* at 4. As she was selecting a stamp, her grandson pushed the coin return button and the alarm sounded. *Id.* at 3. He began to cry and she reached down to pick him up without dropping to her knees to do so. *Id.* at 3-5. She dropped her purse and its contents fell out. *Id.* at 4. Her wallet was behind her, and reached down within arms length of the floor to pick it up as she left the building with her grandson. *Id.* at 6, 8. She estimates that she was exposed to the alarm for approximately one minute. *Id.* at 10.

The United States' expert indicated that, if Pickens was standing at her full height in front of the 1625B, she would have been exposed to an average of 90 decibels at 6, 12 or 24 inches from the machine. (Mot. Summ. J. Memo., # 33, Ex. A, at 13.) Had she bent down to the floor, with her ear 26 inches from the floor, she would have been exposed to an average noise level of 94 decibels at 6, 12 or 24 inches away. *Id.*

After her encounter with the alarm, she reported what happened to the Sherwood postmaster. (Kracke Decl. Ex. B at 31.) He believed her complaint of ringing in her ears because, due to her age, he thought "maybe it affected her more." (Breiner Decl. at 5, Kracke Decl. Ex. C at 52.) Pickens had no prior complaints of hearing loss and now reports continuous, high-pitched ringing in her ears that keeps her from sleeping and has lead to depression. (Kracke Decl. Ex. A-4 at 1-2.) She sought treatment for this condition. (Kracke Decl. Ex. A-1, Ex. A-2, Ex. A-3, Ex. A-4.)

### III.    Pickens' Expert Disclosure

Pickens and the United States exchanged expert reports on the March 18, 2010 deadline to do so. (Supp. Martin Decl., #29, at 2.) Picken's expert disclosure included a three-page statement by Michael Fairchild. (Supp. Martin Decl., Ex. B.) On June 8, Pickens filed a new expert statement from Fairchild in response to the United States' motion for summary judgment. (Supp. Martin Decl. Ex. C.) This was the first time the United Sates saw the new Fairchild statement. (Supp. Martin Decl. at 2.)

The new Fairchild statement differed from the original statement Pickens provided to the United States within the deadline for exchange of expert testimony statements.[1] Fairchild's March statement was only three pages long and contained only four sub-headings, while Fairchild's June statement was eight pages long and contained eleven sub-headings. (Supp. Martin Decl. Ex. C.) Fairchild's new statement contained many additions:  reference to review of Pickens' medical records; opinions that Pickens' injury was foreseeable and that the United States' conduct was unreasonable; an assertion that Pickens' injury could have been prevented by modifications to the alarm or warnings; a section on the "nature of sound and measurement;" further explanation of the applicable standards for sound exposure; description of the acoustics of the post office; an allegation that Pickens had no prior symptoms before the alarm went off; an assertion that the exemplar alarm used for testing was not conclusive of the actual level of noise to which Pickens was exposed; discussion of the intent behind the alarm; and a description of

---

[1] To easily visualize the differences between the original and new Fairchild statement, Picekns has submitted a copy of Fairchild's new statement with additions to the old statement indicated by yellow highlighting and changes from the old statement indicated by both highlighting and underlining. (Pl.'s Opp. to Mot. to Strike, #59, Ex. A.)

Page 5 - OPINION AND ORDER

Pickens' susceptibility to the effects of noise. *Id.* Additionally, Fairchild changed his opinion

from the original statement that Pickens obtained "some, but not complete relief in managing her

alleged tinnitus" to now state that Pickens "has obtained little relief . . . ." (Supp. Martin Decl.

Ex. B at 2); (Supp. Martin Decl. Ex. C at 3.)

**IV.    Regulations and Industry Standards**

The Occupational Health and Safety Administration regulations provide that employers

may expose workers to 115 decibels for fifteen minutes a day, 110 decibels for thirty minutes,

and 100 decibels for up to two hours per day. (Mot. Summ. J. Memo., Ex. A, at 5.) The

regulations allow exposure to 95 decibels for four hours per day and to 90 decibels for eight

hours per day. *Id.* The National Fire Protection Association fire alarm and signaling code

recommends 110 decibels as an alarm's maximum total sound pressure. *Id.* The Uniform

Federal Accessibility Standards provides that audible alarm signals shall not exceed 120 decibels.

*Id.* At least three private companies advertise that their vending machine alarms reach 128

decibels. *Id.* at 12. Pickens' expert, Fairchild, however, opined in his March 2010 expert report

that the OSHA permissible exposure level is not a "safe level of noise" and instead represents a

"political compromise," and that, in fact "a positive safe level of exposure is between 70 and 75

decibels." (Pl. Opp., #59, Ex. A at 5.)[2]

The parties dispute the level of noise that Pickens was exposed to when the 1625B alarm

sounded. The United States' expert report states that testing of the 1625B's alarm system found

---

[2] The Unites States objects to this statement as lacking evidentiary foundation. In
addition, the United States has moved to strike the entire Fairchild report because Pickens
submitted a new Fairchild report in response to the United States'motion for summary judgment.
I address those objections below.

that the alarm's maximum and average noise levels, at all distances, were within the standards set forth above. (Mot. Summ. J. Memo., Ex. A, at 12.) At one inch from the floor and six inches from the machine, the alarm reached a maximum of 103.8 decibels and the average was 101.3 decibels. *Id.* Pickens' March 18 expert report, however, states that, when Pickens picked up her purse and grandson, she was exposed to 103 decibels and that, combined with her grandson's crying, the exposure was "about" 108 decibels. (Pl. Opp., #59, Ex. A at 6.)

## IV.    Knowledge of Other Instances of Hearing Loss or Damage

The lead sales associate at the Sherwood branch, who worked there from 1981 until 2009, heard the security alarm sound every two to three weeks, and described the alarm as a "very loud" siren sound. (Kracke Decl., #53, Ex. D. at 9.) She sometimes deactivated the alarm, but at no point felt the need to cover her ears. (Bourne Decl. at 2-3.) Her hearing is very good. *Id.* at 3. In addition, she never saw any customers holding their ears or that appeared distressed as a result of the alarm volume. *Id.* at 3. At least one time, a customer complained that the alarm was annoying. (Kracke Decl., Ex. D. at 20, 34.)

The Sherwood postmaster held one ear when approaching the 1625B to deactivate the alarm and thought the alarm was too loud, but never experienced any discomfort, perceived hearing loss or ringing in his ears. (Breiner Decl. at 3-4.) He could recall only a "few instances" and a "couple of occasions" over a thirteen-year period, where customers would hurriedly leave the lobby when the alarm sounded, move away from the machine, or cover their ears. (Breiner Decl. at 3; Kracke Decl. Ex. C at 30, 57.) Customers gestured or told him the alarm was loud, and, at some point before July 2005, he asked if the alarm volume could be lowered but was informed that it could not be altered. (Breiner Decl. at 3, 5; Kracke Decl. Ex. C at 31, 39, 55,

57.)  In most instances, customers would remain in the outer lobby while the alarm sounded. (Bourne Decl. at 3, Breiner Decl. at 3, Kracke Decl. Ex. C at 31.)  With the exception of Pickens, the postmaster never received any written complaint about the 1625B alarm system, nor did he hear any concerns about the system from other postmasters or postal employees.  (Breiner Decl. at 6.)

Employees outside of the Sherwood branch also indicated that they had no indication that the alarm could cause physical harm.  A training specialist who served for sixteen years indicated that he trained hundreds of employees on the 1625B, that the training involved the alarm sounding in class, and that no student ever requested ear plugs or ear phones or complained in any way about the volume of the alarm.  (D'Amato Decl. at 3.)  The training specialist himself was exposed to the alarm thousands of times but did not suffer any impairment to his hearing. *Id.*  The technician responsible for maintaining vending machines in the Portland District indicates that he has heard the alarm more than 100 times but has never felt the need to protect his ears, nor has he suffered any hearing damage.  (Cort Decl. at 3.)  In addition, with the exception of Pickens' case, no attorneys, paralegals, or claims adjudicators at the Postal Service's National Tort Center have knowledge of any other administrative claims or lawsuits that allege hearing loss or damage as a result of a vending machine alarm.  (Beatty Decl., # 35 at 3.)  The Postal Service's Oregon District Tort Claims office also has no knowledge of any administrative claim, other than Pickens', alleging hearing loss or damages from a stamp vending machine alarm.  *Id.*

//

//

## LEGAL STANDARDS

### I.    Motion to Strike

Federal Rule of Civil Procedure 37 provides for sanctions against a party who "fails to

obey an order to provide or permit discovery." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th

Cir. 2006) (citation omitted).    Rule 26(a) requires that a party disclose the identity of any expert

who may testify at trial, along with a written report prepared and signed by the expert witness

that contains "a complete statement of all opinions to be expressed and the basis and reasons

therefor." Fed. R. Civ. P. 26(a)(2)(A).  Federal Rule of Civil Procedure 37(c)(1) provides "[i]f a

party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party

is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or

at a trial, unless the failure was substantially justified or is harmless...." Fed. R. Civ. P. 37(c)(1).

Thus, a party may still use its expert witness evidence if the failure to timely disclose that

evidence was either "substantially justified" or "harmless." *Yeti By Molly, Ltd. v. Deckers*

*Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  District courts have "particularly wide

latitude ... to issue sanctions under Rule 37(c)(1)." *Id.* at 1106.  It is the obligation of the party

facing sanctions to show that its failure to comply with Rule 26(a)(2) was either substantially

justified or harmless. *Id.* at 1107.

### II.    Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  Summary

judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  The court cannot weigh the evidence or determine the truth and must

construe the evidence in the light most favorable to the nonmoving party.  *Playboy Enters., Inc.*

*v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002).  An issue of fact is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  *Villiarimo v. Aloha Island*

*Air. Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citation omitted).[3]

## DISCUSSION

I.     **Motion to Strike**

       The United States moves to strike Pickens' expert statement of Michael Fairchild.

Because only pleadings are subject to a motion to strike, I deny this motion to strike an expert

statement.  *See Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (1983).  Nevertheless, I

consider whether Pickens violated Fed. R. Civ. P. 26(a)(2)(C) by submitting a new expert

statement after this court's deadline, and, if so, whether I should impose a sanction upon Pickens

under Fed. R. Civ. P. 37(c)(1) for that violation.  *See*  Fed. R. Civ. P. 26(a)(2)(C)("A party must

make these [expert] disclosures at the times and in the sequence that the court orders.");  Fed. R.

Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule

26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a

motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.")

Here,  Pickens filed a significantly changed expert report nearly three months after this court's

---

       [3] Pickens mistakenly cites Oregon law for the applicable summary judgment standard.
"[U]nder the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and
federal procedural law."  *Snead v. Metropolitan Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1090 (9th
Cir. 2001).

deadline for exchange of expert statements.  Pickens does not dispute that she violated this

court's scheduling order,  but nevertheless contends that Pickens' late filing was not in bad faith

and that even if the court decides to exclude the majority of Fairchild's additions and changes,

two statements should be permitted because they are not prejudicial and merely supplemental to

content in Fairchild's original report.

Because Pickens does not show that her failure to comply with Rule 26(a)(2) was either

substantially justified or harmless, I determine that sanctions are appropriate.  As an initial

matter, Pickens' contention that her new expert report was not filed in bad faith simply does not

amount to an affirmative justification for untimely submission.  Further, Fairchilds' new report is

prejudicial to the United States in several regards.  First, the report advances a new theory of

negligence, the United State's failure to include warnings on the machine or the building

entrance, that was not properly plead in Pickens' complaint.[4]  Second, the expert statement

explicitly and implicitly responds to the United States' arguments for summary judgment.  *See,*

*e.g.* Supp. Martin Decl., #55, Ex. C at 8 ("Defendant argues that its employees were exposed to

the alarm at issue hundreds of times . . . . This is no surprise . . . .")  Finally, allowing to Pickens

to rely on the new statement would disrupt the court's schedule and the prevent the efficient

resolution of this case. *See Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1060 (9th Cir.

2005) (holding that plaintiff's attempt to disregard a deadline for expert disclosure was not

harmless even though trial was still months away and emphasizing that "[p]arties must

understand that they will pay a price for failure to comply strictly with scheduling and other

---

[4] This court previous denied Pickens' motion for leave to amend her complaint to include failure to warn as a new theory of negligence.

orders, and that failure to do so may properly support severe sanctions and exclusions of evidence.")

The one exception, however, is Fairchild's newly added acknowledgment of his review of Pickens' medical records, which I permit as a supplement to his original statement.[5] Rule 26(e) requires litigants to supplement expert disclosures when original report is materially incomplete or incorrect. Fed. R. Civ P. 26(e). Here, when submitting the original Fairchild statement, counsel for Pickens specifically reserved the right to supplement the Fairchild statement following receipt of Pickens' OHSU medical records. (Supp. Martin Decl., #55, Ex. A at 2.) Thus, the single new phrase in Fairchild's updated statement where he references review of Pickens' medical records can be substantially justified as a supplement to the original statement.[6] (Supp. Martin Decl., #55, Ex. C at 2) ("This report is based on: . . . other medical records (Ex. A-1, A-2, A-3, A-4) . . . .") Moreover, this additional reference is harmless to the United States because it asserts no new theories or facts and is not responsive to the United States' motion for summary judgment. In sum, sanctions are appropriate for Pickens' untimely filing of the new Fairchild expert statement, although addition of the single phrase referencing Pickens' medical

---

[5] Pickens also argues that Fairchild's slight change in wording regarding Pickens current tinnitus symptoms is also a supplement to his original report. *Compare* Supp. Martin Decl. Ex. B at 2 (Pickens experienced "some, but not complete relief in managing her alleged tinnitus") *to* Supp. Martin Decl. Ex. C at 3 (Pickens "has obtained little relief" from her symptoms). I disagree, because unlike the revision concerning medical records, this minor semantic change does not appear to be based on any new information nor is it required as a material correction to the original report. *See* Fed. R. Civ. P. 26(e) (party must supplement or correct disclosure if "the party learns that in some material respect the disclosure or response is incomplete or incorrect").

[6] Alternatively, since Pickens asserts in briefing that Fairchild had actually reviewed Pickens' medical records at the time of the March report, the new phrase could be justified as a supplemental correction of the earlier report.

Page 12 - OPINION AND ORDER

records would have been proper as a supplement to the original statement.

Federal courts are given "particularly wide latitude" in their discretion to issue sanctions under Rule 37(c)(1). *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). District courts strictly enforce the expert witness disclosure requirements in Rule 26(a) and have held that exclusion of expert testimony "is an appropriate remedy for failing to fulfill" those requirements. Thus, Pickens may not use Fairchild's updated expert statement, with the exception of the single phrase described referencing medical records, to supply evidence for its opposition to the United States' motion for summary judgment. Pickens, however, may rely on the original Fairchild statement that was exchanged in accordance with this court's deadlines.

## II.    Motion for Summary Judgment

This court has jurisdiction in this case under 28 U.S.C. § 1346(b), since Pickens has sued the United States for negligence. Under 28 U.S.C. § 1346(b)(1), the United States is liable for "the negligent or wrongful act or omission of any employee . . . acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Thus, courts charged with assessing liability of the United States must apply the law of the state where the alleged tort occurred. *Oberson v. USDA*, 514 F.3d 989, 999 (9th Cir. 2008). Consequently, I apply Oregon law in evaluating the United States' motion.

Oregon's leading case on negligence holds that in common-law negligence actions, the defendant's liability for the plaintiff's injury depends not on whether defendant owed a duty to the plaintiff, but on whether the defendant's conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari v. Portland School Dist.*

*No. 1J*, 734 P.2d 1326, 1336 (Or. 1987). Thus, to prove a claim for negligence, the plaintiff must

establish the following elements: "(1) that defendant's conduct caused a foreseeable risk of harm,

(2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that

defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of

plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was

within the general type of potential incidents and injuries that made defendant's conduct

negligent." *Solberg v. Johnson*, 760 P.2d 867, 870 (Or. 1988) (citing *Fazzolari*, 734 P.2d 1326).

The Oregon Supreme Court has held that both the foreseeability of risk of harm to a plaintiff and

the reasonableness of defendant's conduct are empirical questions that generally should be

determined by a factfinder except in an "extreme case." *Donaca v. Curry County*, 734 P.2d

1339, 1344 (Or. 1987) ("The existence and magnitude of the risk . . . bear on the foreseeability of

harm. The feasibility and cost of avoiding the risk bear on the reasonableness of defendant's

conduct. Both clearly are empirical questions. We do not mean that they must in every case be

submitted to a jury; in an extreme case a court can decide that no reasonable factfinder could find

the risk foreseeable or defendant's conduct to have fallen below acceptable standards.")

Here, the United States argues that Pickens' negligence claim fails as a matter of law

because Pickens does not provide evidence creating a genuine factual dispute concerning the first

and third elements. Although it is debatable whether Pickens has created a factual dispute about

foreseeability of risk of harm, the first element of negligence, Pickens has certainly not created a

genuine issue of fact concerning the third element, whether the United States' conduct was

unreasonable. Moreover, the result would have been the same even if I had permitted Pickens to

rely on Mr. Fairchild's untimely filed expert statement.  Thus, I grant summary judgment in favor of the United States.

### A.    Foreseeable Risk of Harm

The United States argues that its conduct did not cause a foreseeable risk of harm because: (1) the level of noise emitted by the security alarm to was within applicable safety standards; and (2) the lack of complaints concerning hearing-related injuries caused by the alarm made such an injury unforeseeable.  Pickens does not dispute that the sound level emitted by the alarm was within applicable standards, but contends that compliance with such standards is not dispositive in determining foreseeability.  Pickens argues that an injury from the alarm was foreseeable because the postmaster was aware that the alarm was too loud and because the postmaster was not surprised that Pickens suffered a hearing-related injury from her exposure to the alarm.[7]

### 1.    Noise Level Safety Standards

Oregon courts have consistently held that even where a statutory standard of care does not

---

[7]At oral argument, Pickens proposed a different theory of foreseeability.  She noted that even exposure to levels of sound that comply with industry standards can cause hearing loss in 15% percent of the population.  Thus, Pickens contended, given the hypersensitive nature of the alarm and the possibility of hearing loss from exposure, it was foreseeable that the defendant's failure to warn customers of the loud alarm would result in a customer suffering a hearing-related injury when the alarm was improperly triggered.  This argument is not persuasive for several reasons.  First, it relates to defendant's potential failure to warn and defendant's use of a defective alarm, both of which are negligence theories that Pickens has failed to properly allege in her complaint.  Second, even if properly alleged, the facts in the record do not support Pickens' contention that the alarm was hypersensitive.  Although the alarm was described as being hypersensitive when the internal keypad was improperly operated by post office staff maintaining or refilling the machine, there is little evidence that the alarm was hypersensitive to post office customers using the machine to purchase products.

Page 15 - OPINION AND ORDER

apply to a tort defendant, compliance with safety rules promulgated by state and federal

authorities provides some indication of whether the defendant met the relevant standard of care.

*Hansen v. Abrasive Eng'g & Mfg.*, 856 P.2d 625, 629 (Or. 1993). Here, although the parties

disagree about the level of noise to which Pickens was exposed, even Pickens' noise exposure

estimate of 108 decibels falls within the Occupational Health and Safety Administration

maximum levels for industrial noise exposure (115 decibels for fifteen minutes a day),  National

Fire Protection Association fire alarm and signaling code maximum total sound pressure (110

decibels) and Uniform Federal Accessibility Standards audible alarm signals maximum (120

decibels).  Thus, there is no factual dispute that Pickens' noise level exposure was authorized by

applicable standards.  Even though Pickens' expert asserts that noise exposure within the OSHA

standards is not necessarily safe, I exclude that particular statement from consideration on this

motion for summary judgment because, absent any reliable authority to support that conclusion,

the statement would be inadmissible at trial.  Nevertheless, the fact that Pickens was exposed to

noise within the applicable standards does not conclusively establish that  the 1625B machine's

alarm did not create a foreseeable risk of injury.

Further, the cases cited by the United States that reference OSHA noise exposure

regulations do not require this court to grant summary judgment on a negligence claim merely

because the noise exposure fell below the maximum allowable levels.  In  *Hoier v. Global*

*Digital Media Exchange, Inc.*, an employee claimed he suffered permanent hearing loss and other

injuries as the result of a "tonal blast" during an test of an evacuation alarm system at his

workplace. *Hoeier v. Global Digital Media Exchange, Inc.* No. B183060, 2006 Cal. App. Unpub. LEXIS 10824, at *2 (Ct. App. Nov. 29, 2006).   The employee sued the building owner and manager, the designer and the installer of the alarm system, and the manufacturer of components of the system for negligence. *Id.* A defense expert measured the alarm's maximum noise level at 115 decibels, within the applicable OSHA and NFPA standards. *Id.* at *3. Another defense medical expert found that the employee's hearing loss was not a result of an acute acoustical trauma due to an alarm tone burst, but rather was caused by a cumulative noise exposure over a prolonged period, exacerbated by the employee's work history as a rock musician, producer and audio engineer. *Id.* Following the presentation of evidence at trial, the trial court granted motions for nonsuit in favor of the system designer and manufacturer and the jury returned a verdict in favor of the building owner, manager, and system installer.  The employee appealed, challenging both pretrial evidentiary rulings and the trial court's grant of nonsuit in favor of the system designer and manufacturer. *Id.* at *8.   The California appellate court affirmed the trial court's grant of nonsuit against the alarm manufacturer because the employee failed to present evidence of either the manufacturer's duty to test, inspect or warn about its product or the manufacturer's breach of such a duty. *Id.* at *30-31. Although the court noted that "evidence established the alarm tested satisfied occupational safety and other workplace standards," that factor was not determinative in the court's decision. *Id.* at *31.  Thus, *Hoier* is distinguishable from this case in a number of respects: it does not analyze the applicability of industry noise exposure standards to the foreseeability of harm, it does not address the use of those standards as evidence on summary judgment, and it does not involve a

plaintiff who had no prior history of hearing loss.

In *Salas v. Wetherington*, a state prisoner filed a § 1983 action alleging that the correctional institution and its officers were liable under the Eight Amendment because fire alarms that activated and stayed on for an excessive period of time caused permanent damage to his ear drum. *Salas v. Wetherington*, No.1:03-CV-32 (WLS), 2005 U.S. Dist. LEXIS 38042, at *1–2 (M.D. Ga. Nov. 18, 2005). Defendants moved for summary judgment contending that the plaintiff failed to produce evidence of deliberate indifference to a substantial risk of serious harm. The defendants showed that prison log books had no entry for a fire alarm sounding during the time period in question, that the prisons fire alarms sounded at 103 decibels, a level considered to be safe by OSHA, and that any hearing damage the plaintiff sustained did not occur as a result of loud noises such as the fire alarm bells. *Id.* at *6–7, 8-9. In granting the defendant's motion for summary judgment, the district court concluded that "[t]he plaintiff's allegations remain unsupported by credible evidence and are largely conclusory, falling far short of overcoming the defendants' summary judgment showing." *Id.* at *10. Consequently, *Salas* does not establish that summary judgment is warranted simply because the plaintiff was exposed to sound levels within the OSHA standards. In sum, as my analysis in the next section demonstrates, the United States could have created a foreseeable risk of injury even though the 1625B alarm emitted noise levels deemed acceptable by regulators and industry groups.

### 2.    Complaints Indicating Foreseeability of Injury

Whether a risk is foreseeable is a factual inquiry. *Lamorie v. Warner Pacific College*, 850 P.2d 401, 402 (Or. Ct. App. 1993). The actual sequence of events causing an injury

does not have to be predictable in order for the injury to be foreseeable. *Id.*, *citing Fazzolari v. Portland School Dist. No. 1J*, 734 P2d 1326, 1338 (Or. 1987). Oregon cases establishes the general principle that injury need only fall into the general category of risk reasonably to be anticipated to be foreseeable. *Connolly v. Bressler*, 583 P2d 540, 542 (Or. Ct. App. 1978).

Pickens relies primarily on this principle of Oregon law to argue that her injury was foreseeable.[8] In *Ollison v. Weinberg Racing Assoc., Inc.* 699 P.2d 847 spectators at a racing track on "Fan Appreciation Night," where alcohol was sold at less than half the normal price, were injured when another spectator fired a gun and caused a stampede. The spectators alleged that the risk of injury was foreseeable because the track had reason to know, based on past experience, of the likelihood of dangerous conduct by patrons when alcohol was sold. The Court of Appeals reversed the trial court's dismissal of the complaint for failure to state a claim, holding that "a jury could find it foreseeable that some patron's misbehavior could cause a disturbance resulting in rapid crowd movements that could result in injury to bystanders." *Id.* at

---

[8] Pickens also cites a Missouri state case for the proposition that tinnitus, though uncommon, can be a foreseeable injury from exposure to an alarm. *Simonian v. Gevers Heating & Air Conditioning, Inc.*, 957 S.W.2d 472, 476 (Mo. Ct. App. 1997) (plaintiff's allegation that he suffered tinnitus from exposure to a fire alarm was sufficient at the pleading stage for an allegation of proximate cause, since plaintiff averred that exposure to an alarm created a general foreseeability of harm). *Simonian* is not particularly useful here for two reasons. First, *Simonian* addresses the pleading standards for a motion to dismiss, not the more intensive factual inquiry required on a motion to summary judgment. Second, *Simonian* focused on an analysis of proximate cause, which is not the issue here on summary judgment, and used a much more permissive test than applies to foreseeability. *Id.* at 476 ("The test is not whether defendant could have foreseen plaintiff's particular injury, but whether . . . defendant's actions set in motion the entire sequence of events culminating in plaintiff's hearing loss.")

851.[9]

Unfortunately, this line of Oregon cases only establish that foreseeability is still a question for the factfinder where an unusual mechanism, like a gunshot-induced stampede or basketball scrimmage, causes an increased risk of any physical injury. This case requires analysis of a very different question. Here, this court must determine whether a reasonable juror could conclude that the existence of a common, unpleasant, but usually harmless condition – loud noise – creates a foreseeable risk of a very specific injury– hearing-related damage. The United States provides one case that is more directly focused on that type of inquiry.

In *Kalmbach v. Hill*, a police officer pulled over a man who drove more than 22 miles per hour above the speed limit with an expired license and without proof of insurance. *Kalmbach v. Hill*, Civil Case No. 07-786-KI, 2009 U.S. Dist. LEXIS 7819 (D. Or. February 2, 2009). There, the police ticketed the man and let him drive away, but eight hours later, the man drove the wrong way on the same highway, striking another car and causing a fatal injury. *Id.* at *9. This court granted summary judgment in the negligence claim, concluding that "[s]peeding, an expired license and lack of proof of insurance are violations of the law that are *qualitatively different*

_____

[9]Another case in this vein not cited by plaintiffs also confirms that the specific injury need not be foreseeable if the general category of risk can be anticipated. In *Lamorie*, a college basketball player's face was swollen and his eyes were black and blue after he injured his nose playing football at a church event. *Lamorie*, 850 P.2d 401, 402 (Or. Ct. App. 1993). The player's coach nevertheless asked him to participate in a basketball scrimmage and the player re-injured his nose and injured his eye during the scrimmage. The Court of Appeals denied summary judgment, holding that a reasonable jury could infer that the coach "knew or should have known that plaintiff's vision was potentially impaired by his injuries" such that he would be at increased risk for any injury if he played basketball and that an injury to plaintiff's eye was foreseeable in the "general category of risk" that could be anticipated in such a situation. *Id.* at 402-403.

from vehicular manslaughter" such that it was not reasonably foreseeable that the speeding and non-moving violations would lead the driver to kill a motorist by driving on the wrong side of the highway. *Id.* at *20-21 (emphasis added). Thus, *Kalmbach* posits that a defendant's knowledge of certain less dangerous circumstances does not imply that a plaintiff's ultimate injury is foreseeable as long as the known risks are qualitatively different from the resulting harm.

Here, it is unclear whether the loud volume of the 1625B alarm is qualitatively different from the alarm posing a risk to damage to the hearing of customers exposed to it. On one hand, courts have recognized the linkage between exposure to loud noises and hearing loss, indicating that exposure to loud noise is qualitatively similar to hearing-related injuries. In addressing a personal injury action under the Federal Employer's Liability by a former railroad employee alleging that he sustained hearing loss as a result of exposure to locomotive horns, the Second Circuit observed that "there is a generally understood causal connection between physical phenomena – in this case, very loud sounds, which we refer to colloquially as 'deafening'– and the alleged injury . . . ." *Turariello v. Long Island Rail Road Co.*, 458 F.3d 80, 88 (2006), *citing Simpson v. Northeast Ill. Reg'l Commuter R.R. Corp.*, 957 F. Supp. 136, 138 (N.D. Ill. 1997)). On the other hand, however, courts have noted that the precise noise level that produces hearing loss is not common knowledge, suggesting that mere exposure to a loud alarm might be qualitatively different from a severe hearing-related injury. *See Turner v. Norfolk & Western Railroad Co.*, 785 S.W.2d 569, 571 (1990).

In this case, the Sherwood postmaster's testimony indicated that he was aware that the

alarm was too loud but not that the alarm was harmful or injurious.  Pickens presents evidence

that the Sherwood postmaster held one ear when approaching the 1625B when the alarm had

activated, thought the alarm was too loud, and had seen customers hurriedly leave the lobby,

move away from the machine, or cover their ears when the alarm sounded.  Consistent with those

concerns, the postmaster asked if the alarm volume could be lowered.  Thus, despite the lack of

complaints of hearing-related injuries, the Sherwood postmaster attempted to reduce the volume

of the alarm.  These facts might permit a reasonable juror to find that the United States' conduct

in continuing to use the loud alarm created a foreseeable risk of hearing-related injury.[10]  On the

other hand, the postmaster never received any previous complaint of hearing-related injury from

---

[10] Pickens also places considerable weight on the following deposition testimony from the
postmaster to show that the risk of hearing-related injury to customers was foreseeable:

> Q: Okay. Did it surprise you that a complaint was made with regard to Mrs. Pickens
> complaining of hearing problems as a result of being close to the vending machine when
> the arm went off?
> A: No.
> Q: Okay. And are you aware that she – did she inform you that she was suffering from
> this kind of ringing in her ears ever since standing next to the machine when the alarm
> went off?
> A: Yes.
> Q: An did that surprise you? Were you surprised that she would suffer that type of injury?
> A: No.
> Q: And why not?
> A: Well, I believed her. And I — since she was an elderly lady, I thought maybe it
> affected her more.

(Kracke Decl., #53, Ex. C at 51-52.)  I, however, do not agree with Pickens that the postmaster's
belief in the truthfulness of Pickens' complaint indicates that the United States created a
foreseeable risk of injury.  The postmaster's testimony shows only that he found Pickens'
complaint credible considering her advanced age, not that such injury was necessarily
foreseeable.

Page 22 - OPINION AND ORDER

any Sherwood customers exposed to the alarm. Further, the Postal Service's national tort claims center had never received any complaints about the noise level of the 1625B alarm. The undisputed evidence shows that Pickens' injury was the first and only one of its kind relating to the 1625B alarm. Thus, this case could also be one of the extreme examples where a judge may find as a matter of law that defendant's conduct does not create an foreseeable risk of injury. I need not resolve this close question now, since I conclude below that Pickens has not created a genuine issue of material fact on another required element of her negligence claim.

**B.    Unreasonable Conduct in Light of Risk of Injury**

Pickens does not provide sufficient evidence to create a genuine issue of material fact concerning the reasonableness of the United States' conduct. In determining whether a defendant's conduct is reasonable under Oregon law, the trier of fact may consider the following factors: (1) the "likelihood of harm;" (2) the "severity of the possible harm;" (3) the "cost of action that would prevent harm;" and (4) the "defendant's position, including the defendant's relationship with the plaintiff." *Fuhrer v. Gearhart By the Sea, Inc.*, 760 P.2d 874, 878 (Or. 1988). Like foreseeability, the reasonableness of a defendant's conduct should generally be determined by a factfinder, except in an "extreme case." *Donaca v. Curry County*, 734 P.2d 1339, 1344 (Or. 1987). Oregon courts are mindful, however, that the reasonableness of defendant's conduct is a separate inquiry from foreseeability of harm. *Graham v. Multnomah County*, 972 P.2d 1215, 1216-1217 (Or. Ct. App. 1999) ("we decline to equate and conflate the elements of foreseeability of harm and unreasonableness of conduct" because to do so would "greatly expand liability for negligence beyond that allowed under *Fazzolari* and its progeny.")

Regarding the first and second factors, "the character and probability of the risk that is claimed to be foreseeable bears on the steps [defendant] reasonably should take to avert it." *Fazzolari*, 734 P.2d at 1338.   Here, the United States has produced ample evidence showing that the likelihood of a postal service customer suffering a hearing-related injury from exposure to the 1625B alarm is vanishingly low.   For example, no individual other than Pickens had entered a claim against the postal service regarding a hearing injury from the alarm, a trainer who triggered the alarm hundreds of times during his classes reported that no student ever complained about the volume of the alarm, and a technician responsible for maintaining vending machines in the Portland heard the alarm more than 100 times but has never felt the need to protect his ears. Moreover, I am not persuaded by Pickens' argument that a risk of a hearing-related injury is much more likely because of the significant frequency of hearing loss from noise exposure nationwide.   (D.'s Mot. for Summ. Judgm., #33-2, Ex. A at 3-4) (statement of United States' expert that "[A]pproximately 15% of people [in the US] between the ages of 20 and 69 have high frequency hearing loss that may have been caused by exposure to loud sounds or noise at work or in leisure activities.")[11]   The expert's statement discusses noise exposure and hearing loss so generally that it sheds little light on the crucial question here: the likelihood of a hearing injury from an approximately one minute exposure to the 1625B alarm.   Therefore, the first factor, likelihood of harm, weighs strongly in favor of the United States.

The second factor, severity of the possible harm, also favors the United States.   Other

---

[11] Pickens' untimely filed expert statement also includes a similar conclusion.   Fairchild's report states that "the current dosage standard for noise leaves 29 percent of the population at risk for substantial hearing loss." (Supp. Martin Decl., #55, Ex. C at 5.)

than reporting Pickens' own tinnitus symptoms, Pickens presents no evidence concerning the severity of possible hearing-related injuries that could be caused by the 1625B alarm. On the other hand, the United States points to OSHA standards suggesting that exposure to the level of noise created by the alarm is harmless even without protective equipment. Thus, Pickens' failure to demonstrate that the alarm presents a risk of severe injury also weighs in favor of the United States.[12]

Concerning the third factor, the cost of action to prevent the harm, the Oregon Supreme Court states that "'[c]ost' includes more than economic cost. Time, effort and risk to defendant are the primary considerations, although monetary cost may also affect the reasonableness of taking action." *Gearhart By the Sea*, 760 P.2d at 878. Here, the evidence presented by both parties demonstrates that considerable costs were associated with modifying or eliminating the alarm. First, the alarm volume could not easily be lowered. The Sherwood postmaster determined that 1625B alarm volume could not be altered because the alarm's sound level was "preset." (Kracke Decl., #53, Ex. C at 55). Moreover, the United States faced significant financial risk and additional security costs if the alarm was eliminated. The 1625B machine in the Sherwood post office was located in an outer lobby open to the public at all hours, where security was a problem and where there had been a prior break-in to postal boxes. The Sherwood

---

[12] The result would have been the same even if Pickens could have relied upon Fairchild's second expert statement. In that report, Fairchild notes that individuals fall on a bell curve from tender to tough ears, such that those with tender ears may "receiv[e] damage to their hearing mechanisms from very short exposure to noise." (Supp. Martin Decl., #55, Ex. C at 8.) Fairchild opined that Pickens "falls far to the end of the tender ear side of the curve." *Id.* Consequently, Fairchild's report suggests that Pickens' alleged injury was among the most severe possible from exposure to the alarm.

machine typically contained over $4,000 in cash and products and other 1625B machines in

Oregon had been victims of break-ins and thefts. (Fernald Decl., #41, ¶2.) Further, vending

machine alarms were viewed as useful security measures to protect postal products, especially

because of the high cost of using security cameras to monitor areas open to the public and

because postal staff would be unlikely to respond to a security situation with a 1625B machine

during the evening and weekend, when the machines were most vulnerable. *Id.* at ¶3; (Cort

Decl., 39, ¶6). In sum, the time, effort, and risk to the United States of eliminating the alarm

indicates that retaining the alarm was reasonable.

Finally, the fourth factor, the defendant's relationship with the plaintiff, does not alter the

balance of this analysis showing that the United States acted reasonably. When the defendant's

relationship to the plaintiff consists of a special relationship defined by existing law, Oregon

courts have examined the reasonableness of defendant's conduct under that special definition.

*See Rex v. Albertson's, Inc.*, 792 P.2d 1248, 1249 (Or. Ct. App. 1990) (in slip-and-fall case in

grocery store, the "obligations of a storekeeper to a customer create a 'special relationship' that

takes the claim out of the general standards of common law negligence.") Thus, the analysis of

the reasonableness of the United States' conduct should proceed under the rules of premises

liability. The United States therefore owes Pickens, a business invitee, the duty to exercise

reasonable care to make the premises reasonably safe. *Woolston v. Wells*, 687 P.2d 144, 150 (Or.

Ct. App. 1984).[13] Reasonable care, in turn, is measured by "what a reasonable person of ordinary

---

[13] In this case, since Pickens does not properly allege either of the two more specific types of premises liability– that the alarm was defective or that the alarm was an unreasonably dangerous condition that could not be encountered with reasonable safety despite her knowledge

prudence would, or would not, do in the same or similar circumstances." *Id.*, *citing Shepler v. Weyerhaeuser Company*, 569 P.2d 1040, 1047 n. 15 (Or. 1977). Thus, in this case, the special standard for business invitees ultimately reduces to ordinary negligence test: whether the United States' conduct was reasonable under Oregon law. Consequently, although a special relationship existed between the United States and Pickens, the existence of that relationship does not alter my general negligence analysis concerning the reasonableness of the United States' conduct.

Overall, the relevant factors compel a finding that there is no genuine issue of material fact concerning the third element of a negligence action, whether the United States' conduct was unreasonable in light of the risk. The Oregon Supreme Court has required that "if the risk is great, either in likelihood or magnitude, and the cost is minimal, the reasonableness of the action should be determined by the factfinder." *Gearhart By the Sea*, 760 P.2d at 878. The opposite is the case here. Both the likelihood and magnitude of the risk of hearing-related injury are low, and the cost to prevent such a risk by eliminating the alarm is high. This is one of the extreme cases where the reasonableness of a defendant's conduct need not be determined by a factfinder. As a matter of law, the United States acted reasonably by employing the 1625B alarm.

//

//

//

//

---

of the danger, *see* 1 Torts §§10.6, 10.7 (Oregon CLE 2006)-- I analyze only the United States's general duty to Pickens described by the court in *Woolston*.

Page 27 - OPINION AND ORDER

## CONCLUSION

For the foregoing reasons, the defendant's motion to strike (#54) is denied. As a sanction under Rule 37, plaintiff's untimely exchanged expert report from Michael Fairchild is disregarded, except for the expert's reference to his review of plaintiff's medical records, which is properly considered as a supplement to the original report.  Defendant's motion for summary judgment (#32) is granted.  Judgment is entered accordingly.


Dated this 10th day of November, 2010.


Honorable Paul Papak
United States Magistrate Judge